UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANN DAVIS,<br><br>            Plaintiff,<br><br>   v.<br><br>THE UNITED STATES OF AMERICA, ET AL.,<br><br>            Defendants. | No. 5:13-cv-00483-CBM-KKx<br><br>**ORDER** |

The matter before the Court is the parties' bench trial. The Court has considered the evidence presented and objections thereto, witness testimony, and oral arguments of counsel. The Court issues the following facts and conclusions. *See* Fed. R. Civ. P. 52(a).

## I. INTRODUCTION

Plaintiff Joann Davis ("Davis") and her husband, Paul Cilley ("Cilley"),[1] filed their initial complaint in this case on March 14, 2013, alleging that on May

---

[1] On the first day of trial, Plaintiff Cilley was voluntarily dismissed with prejudice from this matter.

1

19, 2011, a moon rock in their possession had been wrongfully taken by federal agents from the National Aeronautics and Space Administration ("NASA"). (Dkt. No. 1.) On August 6, 2013, Plaintiff filed the First Amended Complaint ("FAC") against the United States ("Government") and four individual federal NASA agents: Conley, Reynolds, Harrison, and Searle ("NASA Agents"). The FAC alleged five claims against the Government pursuant to the Federal Tort Claims Act ("FTCA"), a claim for petition for return of property under Federal Rule of Criminal Procedure 41(g), and four claims against the NASA Agents pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).

On November 19, 2014, the Court granted summary judgment "on all of Plaintiffs' claims in which Plaintiffs' lawful ownership of the moon rocks is an element." (*See* Order Granting in Part, Denying in Part, Defendants' Motion for Summary Judgment ("MSJ Order"), Dkt. No. 66, at 7.) Accordingly, the Court entered judgment on the FTCA claim for conversion, the petition for return of property, and the *Bivens* claim for wrongful taking. The Court further granted summary judgment in favor of the Government on the FTCA claim for battery. (MSJ Order at 9.) In addition, the Court granted summary judgment in favor of the NASA Agents on the *Bivens* claims for excessive force and wrongful search and seizure. (MSJ Order at 9-13; *see also* Order on Defendants' Motion for Reconsideration, Dkt. No. 77.) The Court also granted summary judgment in favor of all of the NASA Agents – except Defendant Conley – on the *Bivens* claim for wrongful detention. (*See* MSJ Order at 9-13.)[2]

---

[2] Defendant Conley has appealed the MSJ Order, contending that the Court erred in denying his defense of qualified immunity. (*See* Dkt. No. 81.) The Court approved the parties' stipulation to stay this action in its entirety pending resolution on appeal. (Dkt. No. 84.) On May 10, 2016, the Government filed a motion to lift the stay so that the Court could proceed to trial solely on the FTCA claims against the Government. (Dkt. No. 98.) The Court granted the motion to lift the stay. (Dkt. No. 104.)

On January 10, 2017, the Court proceeded to trial solely on the three remaining FTCA claims asserted against the Government: false imprisonment, abuse of process, and negligence. (*See* Final Pretrial Conference Order, Dkt. No 119, *as amended by* Order Regarding Defendants' Motions in Limine, Dkt. No. 124.)

## II. FINDINGS OF FACT

1. On May 11, 2011, Plaintiff Joanne Davis sent an email to NASA requesting the agency's assistance in selling two Apollo 11 artifacts: a moon rock and a piece of the spacecraft's heat shield.
2. The artifacts were encased in clear lucite paperweights.
3. In her email, Davis stated that the artifacts had been given to her late husband by Apollo 11 astronaut Neil Armstrong. (Ex. 11.)
4. There is no evidence before the Court that Davis or her former husband legally acquired or lawfully possessed the moon rock.
5. In her email, Davis stated that she had been unsuccessful in using the internet to identify someone that could help her find a buyer for the moon rock and heat shield. (Ex. 11.)
6. Shortly thereafter, Davis was contacted telephonically by a registered confidential source ("RS") retained by NASA.
7. Over the course of the next several days, Davis and the RS engaged in several telephone conversations, some of which were recorded and monitored by NASA Agent Norman Conley ("Agent Conley").
8. Agent Conley was the lead criminal investigator for NASA's investigation of Davis. His supervisor was NASA Office of Inspector General ("OIG") supervisory criminal investigator, Patricia Searle ("Agent Searle").
9. During the course of her conversations with the RS, Davis stated: (a) she did not keep the moon rock at home; (b) she feared she would be asked to justify her claim that the moon rock had been gifted to her former husband

|   |     | by astronaut Neil Armstrong; (c) she knew of other persons who had gotten into trouble for possessing lunar material; (d) she would never voluntarily relinquish the moon rock to NASA; (e) her husband kept illegal weapons at home; (f) she knew that she would have to resort to utilizing means other than the internet or auction houses to sell the moon rock because those methods had previously been unsuccessful; and (g) she wanted $1.7 million for the moon rock. |

10. At the request of the RS, Davis provided photographs of the Apollo 11 artifacts to him. Agent Conley sent these photographs to a NASA lunar curator to see if they could be authenticated.

11. The NASA lunar curator determined that it could not be ruled out that the photograph depicted genuine Apollo lunar material. However, a determination of the authenticity of the moon rock could only be made by physical examination.

12. Agent Conley secured a search warrant (the "warrant"), issued by a federal magistrate judge for the Central District of California, authorizing: (1) the search of Joann Davis, including any personal effects such as a purse or bag that she may be carrying on her; and (2) the seizure of the "purported Apollo 11 lunar material"[3] and "any documents, records, and photographs showing how Davis came to possess the purported lunar rock and/or showing her knowledge about the purported lunar rock." (*See* Search Warrant, Ex. 4.)

13. Davis and her husband Cilley lived in Lake Elsinore, California.

14. Prior to the execution of the warrant, Agent Conley requested the assistance of a NASA criminal investigator from a NASA OIG office in Southern

---

[3] At trial, it was undisputed that the "Apollo 11 lunar material" as stated in the search warrant affidavit referenced the moon rock Davis possessed.

California. NASA OIG investigator Michael Harrison ("Agent Harrison") volunteered to assist Conley.

15. Agent Conley briefed Agent Harrison on the information that had been provided by Davis to the RS.

16. The NASA Agents contacted the Riverside County Sheriff's Department ("RCSD") and asked if it would be willing to provide local law enforcement support during the execution of the warrant. The RCSD agreed to do so and was interested in investigating Davis' statement to the RS that there were illegal guns in her home.[4]

17. The RCSD deputies present at the scene were neither given directions nor supervised by NASA. The RCSD utilized its own internal protocols and practices.

18. Davis and her husband Cilley arrived at the Denny's in Lake Elsinore to provide the moon rock for inspection to the RS. When they arrived, they went inside the restaurant and sat down in the booth across from the RS. Deputy Cornett from the RCSD and Agents Conley and Harrison were sitting at tables nearby.

19. Davis produced the moon rock and placed it on the table for the RS's inspection. When she did so, Agent Conley, Agent Harrison, and Deputy Cornett approached her table. Agents Conley and Harrison produced their identification.

20. Davis lunged for the moon rock. Deputy Cornett placed his hand on her shoulder from his position behind her booth, and recovered the moon rock from her.

21. Davis does not recall whether any NASA Agent touched her during the time that she was inside the Denny's. Therefore, there is no evidence that any

---

[4] RCSD was not a party to this lawsuit.

5

|   |   |   |
|---|---|---|
| 1 |  | NASA Agent made contact with Davis during the seizure of the moon rock |
| 2 |  | inside the Denny's. |
| 3 | 22. | Shortly thereafter, the NASA Agents, Deputy Cornett, Davis, and Cilley left |
| 4 |  | the restaurant and went into the parking lot. Davis told Deputy Cornett that |
| 5 |  | she had urinated on herself. |
| 6 | 23. | It is RCSD's policy and practice that if a female person is detained or |
| 7 |  | arrested and wants to go to the bathroom, a female deputy responds to |
| 8 |  | escort her to the bathroom. No female NASA Agent or RCSD deputy was |
| 9 |  | present at the scene. |
| 10 | 24. | Davis was separated from Cilley and led to an area of the parking lot next to |
| 11 |  | Agent Conley's van. Upon arriving to that area, Deputy Cornett told Agent |
| 12 |  | Conley that she had urinated on herself. |
| 13 | 25. | Agent Conley asked Davis if she wished to use the restroom to clean up, or |
| 14 |  | whether she would prefer to speak with him inside his vehicle or at her |
| 15 |  | home. Davis declined. |
| 16 | 26. | Agent Conley searched Davis's purse, which contained the heat shield |
| 17 |  | paperweight. The heat shield paperweight was not seized, and was not an |
| 18 |  | item to be seized pursuant to the warrant. Agent Conley then checked |
| 19 |  | Davis's identification, provided her a copy of the search warrant, and filled |
| 20 |  | out a property receipt with the search warrant return. Agent Conley testified |
| 21 |  | that these administrative tasks took about 15 minutes. During this period of |
| 22 |  | time, Davis was not free to leave. |
| 23 | 27. | After finishing the administrative tasks, Agent Conley asked Davis whether |
| 24 |  | she would be willing to stay and answer additional questions, which Davis |
| 25 |  | verbally agreed to do. Davis signed a "Waiver of Rights" form, |
| 26 |  | acknowledging that she was willing to voluntarily waive her custodial |
| 27 |  | interrogation rights and answer questions from Agent Conley without a |
| 28 |  | lawyer present. (Ex. 100.) |

| | |
|---|---|
| 28. | Agent Conley informed Davis that she could refuse to answer any questions or end the questioning at any time. |
| 29. | Agent Conley questioned Davis for approximately 1.5-2 hours in the parking lot about the circumstances of her coming into possession of the moon rock and requested information about who else might also have such lunar samples. |
| 30. | Davis refused to answer several of Agent Conley's questions, including whether she knew other people who might have lunar samples. There is no evidence before the Court that Davis requested to end the questioning. |
| 31. | During the questioning, a law enforcement officer stood behind Davis. Davis felt the officer touch her back several times. Agent Conley asked the officer to stop touching Davis. Davis testified that she did not recall which officer touched her. Conley offered to get cigarettes from Davis's purse during the questioning. Davis declined. |
| 32. | After nearly two hours, Davis was told she was free to go. Davis drove herself home. |
| 33. | Davis was never placed under arrest or handcuffed by anyone while inside the Denny's or outside in the parking lot. |
| 34. | Davis was never confronted with a weapon while inside the Denny's or outside in the parking lot. |
| 35. | Davis testified that someone grabbed her arm while she was sitting at the table in the Denny's and that she hit her tailbone against the table while standing. Photographs at trial depicted some discoloration on Davis's arm. However, Plaintiff offers no medical evidence in support of her alleged injuries. |
| 36. | Davis does not recall whether any NASA Agent touched her during the seizure of the moon rock inside the Denny's or during the execution of the search warrant outside in the parking lot. |

37. On May 22, 2011, Davis sought medical treatment at Inland Valley Medical Center. After speaking with hospital staff and explaining the cause of her injuries, the hospital staff told her that they would have to report her injuries to the RCSD, which would then send personnel to the medical center to witness her examination. Davis decided to leave the hospital against medical advice without receiving treatment. (Ex. 24-1.)

38. At the time of the incidents alleged, Davis was 74 years old.

### III. CONCLUSIONS OF LAW

1. The facts, insofar as they may be conclusions of law, are hereby incorporated by reference.

**Federal Tort Claims Act**

2. This Court's jurisdiction of the remaining claims against the Government is predicated upon the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b) *et. seq.*

3. A tort claim against the government must be presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented. 28 USC § 2401(b). The parties stipulated at trial that Davis made a timely claim under the FTCA.

4. The FTCA is a limited waiver of sovereign immunity, making the government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment. 28 U.S.C. § 1346(b).

5. The government may be held liable for the acts or omissions of an independent contractor and its employees if the government exercises sufficient control over the contractor such that it could be found to be acting

| | |
|---|---|
| 1 | on behalf of the government. *Logue v. United States*, 412 U.S. 521, 528 |
| 2 | (1973); *Valadez-Lopez v. Chertoff*, 656 F.3d 851, 859 (9th Cir. 2011). |

6. Pursuant to the FTCA, the government may be found liable only under circumstances where the government, if a private person, would be liable in accordance with the laws of the place where the wrongful act or omission occurred. 28 U.S.C. § 1346(b).

7. The acts or omissions in this case, along with Plaintiff's alleged injuries, occurred in California. (Findings of Fact 13, 14, 16, 18.)

8. The Government did not exercise sufficient control over the acts or omissions of the RCSD deputies such that they could be found to be acting on behalf of the Government. (Findings of Fact 17.)

**Abuse of Process**

9. The elements of a claim for abuse of process under California law are: (1) an ulterior motive in using the process and (2) the use of the process in a wrongful manner. *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1057 (2006).

10. Lunar material is the property of the United States government. (*See* MSJ Order at 6-7; National Aeronautics and Space Act of 1958, Pub. L. No. 111-314; NASA Policy Directive 1387.2F.)

11. Based on the recorded calls between the RS and Davis, and the inability to determine the moon rock's authenticity, the NASA Agents had probable cause to believe that Davis possessed and planned to sell government property. (Findings of Fact 6, 7, 9.)

12. Based on Davis's representations during the recorded telephone calls with the RS, the NASA Agents had reason to believe that Davis would not voluntarily relinquish the moon rock and that it was potentially unsafe to execute a search and seizure warrant at her home. (Findings of Fact 6, 7, 9.)

| | |
|---|---|
| 1 | 13. Conley obtained a valid warrant for a search of Davis and seizure of the moon rock at the Denny's in Lake Elsinore. (PTCO 5; MSJ Order at 10-12; Findings of Fact 12; Ex. 4.) |
| 4 | 14. There is no evidence before the Court that the NASA Agents had an ulterior motive in obtaining a search warrant to search Davis' person and personal effects and seize the moon rock, or that they executed the search warrant in a wrongful manner. (*See* Findings of Fact 9, 18, 19, 21, 25, 26.) |
| 8 | 15. There is no evidence to support Abuse of Process by the Government in accordance with California law. |

**False Imprisonment**

16. The elements of a claim for false imprisonment under California law are: "(1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *Easton v. Sutter Coast Hosp.*, 80 Cal. App. 4th 485, 496 (2000).

17. A law enforcement officer has a lawful privilege to detain a suspect while a proper search is conducted. *Muehler v. Mena*, 544 U.S. 93, 98 (2005); *Michigan v. Summers*, 452 U.S. 692, 705 (1981).

18. A law enforcement officer has a lawful privilege to detain a suspect for additional questioning "when the circumstances would indicate to a reasonable man in a like position that such a course of action is called for in the proper discharge of the officer's duty." *Dawkins v. City of Los Angeles*, 22 Cal. 3d 126, 133 (1978); *see also United States v. Mendez*, 118 F.3d 1426, 1429 (10th Cir. 1997) (holding that further detention and questioning unrelated to initial traffic stop was permissible where plaintiff voluntarily consented to answer additional questions).

19. Consent is a defense to a false imprisonment claim. *See* Cal. Civ. Code § 3515; *George v. Int'l Soc'y. for Krishna Consciousness of Cal.*, 3 Cal.

| | |
|---|---|
| 1 | App. 4th 52 (1992). Consent must be given freely and voluntarily. *See* |
| 2 | *People v. Camden*, 16 Cal. 3d 808, 1114 (1976). |
| 3 | 20. Voluntariness is based on the totality of circumstances. *Schneckloth v. Bustamante*, 412 U.S. 218, 222 (1973). The Court considers several factors to determine voluntariness of consent including: whether the defendant was in custody; whether the arresting officers had their guns drawn; whether Miranda warnings were given; whether the defendant was notified that she had a right not to consent; and whether the defendant had been told a search warrant could be obtained. *United States v. Soriano*, 361 F.3d 494, 502 (9th Cir. 2004). |
| 11 | 21. A person is "in custody" when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004). |
| 14 | 22. Davis did not consent to confinement inside the Denny's. |
| 15 | 23. After Agent Conley completed the administrative requirements for the search warrant, Davis verbally consented to answer additional questions in the Denny's parking lot. (Findings of Fact 27.) |
| 18 | 24. Davis's consent to additional questioning was free and voluntary. (*See* Findings of Fact 27, 28, 30, 31, 32, 33, 34.) |
| 20 | 25. By signing the "Waiver of Rights" form, Davis knowingly and voluntarily waived her *Miranda* rights to remain silent and to have an attorney present during the additional questioning. (Findings of Fact 27.) |
| 23 | 26. Davis was not "in custody" or subject to a formal arrest during the additional questioning by Agent Conley. (Findings of Fact 31, 32, 33, 34.) |
| 25 | 27. The NASA Agents intentionally confined Davis during the search of Davis and her personal effects while completing the administrative tasks required for the warrant. (*See* Findings of Fact 26.) |

| | | |
|---|---|---|
| 1 | 28. | The NASA Agents intentionally confined Davis in the Denny's parking lot while asking her additional questions. (*See* Findings of Fact 27, 29, 31, 32.) |
| 3 | 29. | The NASA Agents were lawfully privileged to confine Davis in the Denny's parking lot for additional questioning after the execution of the search and related administrative tasks. *See Dawkins*, 22 Cal. 3d at 133; *Mendez*, 118 F.3d at 1429. |
| 7 | 30. | There is no evidence to support the Government's liability for False Imprisonment in accordance with California law. |

**Negligence**

31. The elements of a cause of action for negligence in California are: "(1) a legal duty to use reasonable care, (2) breach of that duty, and (3) proximate cause between the breach and (4) the plaintiff's injury." *Mendoza v. City of Los Angeles*, 66 Cal. App 4th 1333, 1339 (1998).

32. There is no evidence that the NASA Agents breached any legal duty of reasonable care during the course of detaining Davis during the execution of a valid search warrant, or questioning Davis in the Denny's parking lot following her consent.

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

\\
\\
\\
\\

33. There is no evidence to support the Government's liability for Negligence under California law.[5]

DATED: March 17, 2017

_____
CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

---

[5] Although the Government's conduct in this case does not rise to the level of conduct necessary to find liability pursuant to a federal tort claim, the Court expresses concern over the Government's decision to conduct a search of a female individual without a female agent present at the scene. (*See, e.g.*, Findings of Fact 23 (RCSD's policy and practice of employing female officers to assist with female individuals).)